UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

TIMOTHY M. WROBEL,

                                        Plaintiff,

            -vs-                                        03-CV-277C(SC)

COUNTY OF ERIE;
DOUGLAS NAYLON, Individually and in his
official capacity as a County Employee;
and DANIEL RIDER, Individually and in his
official capacity as a County Employee,

                                        Defendants.

_____

APPEARANCES:    CHIACCHIA & FLEMING, LLP (CHRISTEN ARCHER PIERROT,
                ESQ., of Counsel), Hamburg, New York, for Plaintiff.

                OFFICE OF THE ERIE COUNTY ATTORNEY (KRISTIN KLEIN
                WHEATON, ESQ., of Counsel), Buffalo, New York, for Defendants
                County of Erie and Daniel Rider.

                LIPSITZ GREEN SCIME CAMBRIA LLP (ROBERT L. BOREANAZ,
                ESQ., of Counsel), Buffalo, New York, for Defendant Douglas Naylon.


**BACKGROUND**

        This action was originally brought in Supreme Court, Erie County, on March 19,

2003, and was removed to this court on April 8, 2003 (Item 1).   In an order filed

December 17, 2004 (Item 35), the court dismissed plaintiff's cause of action under the New

York State Human Rights Law, and directed plaintiff to file an amended complaint so as

to draw his claim under Title 42 U.S.C. § 1983 with more specificity.   In the amended

complaint, filed January 18, 2005 (Item 36), plaintiff alleged that he was transferred from

his position at the Aurora facility of the Erie County Public Works Department, Highway

Division, in retaliation for his exercise of the rights of freedom of speech, political affiliation, and other intimate association guaranteed by the First Amendment.

Defendants moved to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(6) (Items 38, 40). Plaintiff opposed the motion and moved for permission to file a second amended complaint so as to add a claim under section 1983 for the violation of his Fourteenth Amendment right to due process (Item 48). In a Decision and Order dated February 27, 2006, the court granted the motions to dismiss and denied the plaintiff's motion to amend the complaint (Item 59).

Plaintiff appealed the decision to the Second Circuit, which affirmed in part, vacated in part, and remanded the matter for further proceedings. The court found that plaintiff had sufficiently alleged that he was "retaliated against for his lack of political affiliation with, or his refusal to pledge his allegiance to, the new Erie County administration" (Item 63, p.3). Additionally, the Second Circuit found that plaintiff had sufficiently alleged a First Amendment retaliation claim based on his expression of protected speech following his transfer. *Id.,* pp.3-4. The Second Circuit affirmed the dismissal of plaintiff's First Amendment claim based on statements made by plaintiff's wife, and found that the court did not abuse its discretion in denying plaintiff's motion for leave to amend the complaint. *Id.,* p.4.

Following an unsuccessful attempt at mediation, the defendants moved for summary judgment (Items 84, 90). Plaintiff filed papers in opposition to the motions (Items 99 -104), and defendants filed reply memoranda (Items 108, 109). The court determined that oral argument was unnecessary. For the reasons that follow, the motions for summary judgment are granted, and the complaint is dismissed.

**FACTS**

As stated in the amended complaint, plaintiff began his employment with the County of Erie in 1978 and was employed as a blacksmith with the Department of Public Works, Division of Highways, assigned to the Aurora Highway barn (Item 36, ¶ 5). Plaintiff obtained employment with Erie County through a neighbor who advised him of openings in the Highway Department. He completed an application and was hired (Item 102, Exh. A, p. 359).

Following the 1999 election of Joel Giambra, the Republican candidate, as Erie County Executive, defendant Naylon became the Aurora Senior District Highway Engineer, and defendant Rider became the Deputy Highway Commissioner (Item 36, ¶¶ 11-13). Plaintiff was supervised by Naylon, who was in turn supervised by Rider. Plaintiff alleges that neither Naylon nor Rider was qualified for his position. *Id.,* ¶ 14.

In his deposition, plaintiff characterized himself as "the employee that socialized with all my fellow workers" at the Aurora barn (Item 102, Exh. A, p. 307). He testified that he had social relationships with co-workers Paul Rebrovich, Gary Kane, and Linda King, among others. *Id.,* pp. 52, 54, 59. Plaintiff was unaware of the political party affiliations of his co-workers. *Id,* p. 401. He was unaware of the political beliefs of or any political activity by Paul Rebrovich. *Id.,* pp. 402-03. To plaintiff's knowledge, Rebrovich started out as a laborer and worked his way up to a foreman position. *Id.,* p. 404. They did not discuss politics. *Id.,* p. 408. Plaintiff did not hold himself out as having any political affiliations or associations during his tenure as a County employee. *Id.,* p. 411. He was never asked to buy a ticket to a political event, or to support a particular candidate. *Id.,* p. 305-06. Plaintiff was not aware if any of the previous district managers got their jobs

through some political association.  *Id.,* pp. 405-06.  He did not hold a position with the union.  *Id.,* p. 125.

In the fall of 2000, on Naylon's first day of work, while plaintiff was driving Naylon from his home to the workplace, Naylon asked plaintiff his political affiliation during the course of a 15-minute conversation (Item 102, Exh. A, p. 309).  This is the only time that plaintiff could recall being asked about his political affiliation.  *Id.,* p. 312.  Plaintiff told Naylon that he was a Republican, and the discussion on that subject ended.  *Id.,* p. 345.  During this conversation, Naylon acknowledged that plaintiff was a long-time County employee and asked "who are the guys that put forth or work or do their jobs and who are the goof offs?"  *Id.,* p. 339.  Plaintiff was uncomfortable with the question and told Naylon to "give it a couple of weeks and I am sure you will be able to figure it out."  *Id.,* p. 340.  Plaintiff stated that Naylon wanted to know the good and bad employees, and he was uncomfortable providing that information.  *Id.,* p. 341-43.  Later in 2000, Naylon asked plaintiff which employees socialized together.  *Id.,* p. 354.  Paul Rebrovich told plaintiff that Naylon asked him to make a list of the good employees and the bad ones.  *Id.,* p. 358.

In December 2000, plaintiff came to believe that Naylon was mistreating the employees of the Aurora barn and acting illegally (Item 102, pp. 285-86).  Plaintiff spoke to a union representative to advise them that "something was not right."  *Id.,* p. 123.  He felt he was being "targeted," and the union representative said he would look into it.  *Id.,* p. 258.  Plaintiff also came to believe that Naylon was not in the office as often as he should be.  *Id.,* p. 288.  In December 2000, Naylon mentioned a retired employee who was visiting the Aurora barn and told plaintiff that it didn't "look good" for him and the Giambra administration, and that as the employee was "retired from the Gorski administration" he

4

should be "on his merry way." *Id.,* p. 392. Plaintiff testified that Naylon criticized his work and failed to give verbal or written warnings regarding disciplinary infractions. *Id.,* pp. 128-29, 171. Plaintiff testified that, prior to Naylon's tenure, the district engineer did not criticize the employees' work and the assignment of jobs was left to the employees. *Id.,* p. 172.

On January 31, 2001, plaintiff had a conversation with Naylon. Plaintiff wanted to talk about work details and Naylon's treatment of him (Item 102, Exh. A, pp. 364). The men began to argue, and Naylon suggested that plaintiff transfer to another work site. *Id.,* p. 366. Naylon used the term "old regime" three or four times to describe workers at the Aurora barn, including during the January 31, 2001 conversation. *Id.,* p. 397. Naylon once stated that plaintiff was from the "old regime." *Id.,* p. 411.

Following the January 31, 2001 conversation with Naylon, plaintiff was advised by his union representative not to speak to Naylon outside the presence of a union representative (Item 102, Exh. A, p. 406). He was told by Linda King, Naylon's secretary, that Naylon was monitoring the number of plaintiff's telephone calls. *Id.,* pp. 408-09.

On March 1, 2001, plaintiff received a letter from defendant Rider advising him of six disciplinary infractions lodged against him, including insubordination, tardiness, and falsification of County records, and advising him to appear for a disciplinary hearing on March 5, 2001 at the Aurora office (Item 88, Appx. M). Plaintiff stated that there was no basis for the charges (Item 102, Exh. A, pp. 167-68). However, in his deposition testimony, plaintiff admitted that on one occasion, he completed a work log to reflect that he had finished work that had not been done, as that had been the "past practice." *Id.,* pp. 183-85). He considered it petty that Naylon would criticize the practice. *Id.,* p. 188. Plaintiff acknowledged that Naylon instructed him not to leave the work site to collect dead deer

5

carcasses from the county roads, which he had been doing for approximately ten years. Despite this instruction, plaintiff stated that he was given permission to do so by Paul Rebrovich in Naylon's absence. *Id.,* p. 196. Plaintiff also admitted he was late to work on occasion, but that the time clock malfunctioned. *Id.,* pp. 212-13. He also acknowledged a 1995 performance evaluation in which his supervisor stated that he needed to improve his punctuality. *Id.,* pp. 508-09.

Plaintiff stated that he attended the disciplinary hearing with Naylon and Rider in Naylon's office on March 5, 2001. He was not allowed to explain his position, and Naylon could not produce his personnel file which was locked in a file cabinet (Item 102, Exh. A, pp. 223-27). In addition to insubordination and tardiness, plaintiff was accused of taking excessive breaks and personal use of the County telephones. *Id.,* p. 232. After the hearing, plaintiff was told he was being transferred to the Tonawanda barn, and the union filed a grievance on his behalf. *Id.,* pp. 234-35. Following an arbitration, on July 3, 2001, plaintiff received an unfavorable decision (Item 102, Exh. A, p. 239; Item 88, Appx. R). The arbitrator determined that the transfer was not a disciplinary measure (Item 102, Exh. A, p. 241-42; Item 88, App. R, p. 11).[1] An employee from the Tonawanda barn later told plaintiff that Rider came to the Tonawanda barn shortly before plaintiff's transfer and said that they were "getting a f___ up . . . from East Aurora." Item 102, Exh. A, p. 413.

---

[1] In the decision, the arbitrator stated that plaintiff "seemed determined to function as an independent contractor despite any formal designation by the Employer to this effect." Item 88, App. R, p. 9. The arbitrator found that plaintiff had been insubordinate and interfered with management's mission to set work priorities, serious infractions that could have warranted suspension or termination. *Id.,* p. 12. The arbitrator concluded that the transfer was not disciplinary, but was justified by management's right to deploy and utilize the workforce. *Id.*

Upon after his transfer to Tonawanda, plaintiff took a three-week medical leave (Item 102, Exh. A, p. 152). While working at the Tonawanda barn, plaintiff was called in to the office to speak to an investigator from the Erie County Sheriff's Department. The investigator explained that Naylon was looking into the theft of lumber from the Aurora barn, and it was known that plaintiff was building a deck around his swimming pool. *Id.,* pp. 445, 451. Plaintiff explained that he had been transferred, had turned in his keys to the Aurora facility, and had no access to the wood. *Id.,* p. 447. The investigator seemed satisfied with his responses, and left. Plaintiff was unaware if other employees were also questioned. *Id.,* p. 449. Plaintiff also testified that Rider came to see him numerous times at the Tonawanda barn for the purpose of harassing him. *Id.,* p. 108. The day he started at the Tonawanda barn, Rider came to see him, but plaintiff had already left for the day. Plaintiff's supervisor advised him that Rider then returned on two consecutive days, but plaintiff had gone home early due to illness. *Id.,* pp. 430-35. Plaintiff testified that on one occasion, Rider questioned him regarding his continuing contact with Rebrovich and told plaintiff to tell his wife to "stay the f___ out of all County buildings." *Id.,* p. 108. Plaintiff claimed he was further harassed by Rider when he was told to resubmit leave forms for sick leave on three occasions. *Id.,* pp. 109-11. Plaintiff stated that Rider sent him a letter stating that he should submit leave forms prior to taking sick leave. *Id.,* p. 120.

Following his transfer, plaintiff authorized his wife to send a letter to Steve Pigeon, then the chairman of the Erie County Democratic Party, regarding his treatment by Naylon and Rider (Item 102, Exh. A, p. 418; Item 88, Appx. O). He did not read the letter or know of its exact contents (Item 102, Exh. A, p. 419). Plaintiff told his friend Gary Kane, a retired County employee, about the letter. *Id.,* p. 420. Mrs. Wrobel also sent a letter to Eliot

7

Spitzer, who was then the New York State Attorney General, and signed it "Concerned Erie County employees."  (Item 102, Exh, A, p. 421; Item 88, Appx. P.)  The Pigeon letter is dated May 1, 2001, and the Spitzer letter is dated May 17, 2001.  Only plaintiff, his wife, and Kane knew of the letters (Item 102, Exh. A, pp. 424, 426).  Kane set up a post office box for any replies, and neither letter was signed by an individual.  *Id.,* pp. 423-24.  At his deposition, plaintiff confirmed that he had nothing to do with the preparation or writing of the letters to Pigeon or Spitzer.  *Id.,* p. 498.

Plaintiff testified that he met with an agent from the Federal Bureau of Investigation ("FBI") at Linda King's house sometime during the summer or fall of 2001 to discuss his concerns about Naylon's supervision of the Aurora barn (Item 102, Exh. A, pp. 71, 73, 75).[2] He later spoke over the telephone with Agent Rob Gross of the FBI  *Id.,* p. 79.  Plaintiff has no knowledge that anyone from the County knew that he met with the FBI in 2001.  *Id.,* p. 443.  Prior to the letters of May 2001, plaintiff did not speak out on matters regarding the Erie County Highway Department.  *Id.,* p. 472.

Plaintiff alleged in his complaint that individuals were bribed to testify against him during his arbitration, although he stated at his deposition that he did "not know who or if [Naylon] did bribe anyone." (Item 102, Exh. A, p. 457.)  Plaintiff stated that another employee told him that an employee named Frank Catalano "would be the next foreman in the Aurora district because [Naylon] owes [him] one because [he] went to testify against Wrobel at his arbitration."  *Id.,* p. 455.   Another County employee, John Hagerty, told plaintiff that certain people were encouraged to testify against plaintiff, including the man

---

[2]  FBI records reflect that this meeting took place on August 23, 2001 (Item 102, Exh. A, p. 477).

who took over the blacksmith position at the Aurora barn after plaintiff's transfer. *Id.,* pp. 460-61. Hagerty also told plaintiff that he had refused to testify against plaintiff. *Id.,* p. 377. Plaintiff testified that none of the employees he believed were bribed actually testified at the arbitration hearing. *Id.,* p. 505. Plaintiff stated that his name appeared on a lay-off list, but he was not laid off from his County position. *Id.,* pp. 468-69. After four years at the Tonawanda barn, plaintiff was reassigned to the Aurora barn. *Id.,* pp. 279, 468. In September 2003, plaintiff was promoted to the position of auto mechanic and received a raise in pay. *Id.,* p. 511.

Plaintiff acknowledged that he spoke personally to defendant Rider on a few occasions, including his disciplinary hearing, his arbitration proceeding, and a conversation at the Tonawanda plant (Item 102, Exh. A, p. 480). Rider never mentioned politics, political affiliation, or then-County Executive Joel Giambra. *Id.,* p. 481. When asked if he felt his political affiliation or speech had anything to do with his transfer, plaintiff stated that he had "no clue." *Id.,* p. 491.

Plaintiff testified that during his tenure as a county employee, he supported Dan Ward in his campaign for County Executive in 2004 by buying a ticket to a fundraising event, passing out some bumper stickers, and placing a campaign sign on his lawn (Item 102, Exh. A, p. 293–95). He also supported James Keane in the 2008 election for County Executive by distributing campaign signs. *Id.,* p. 298. In 2002, plaintiff put a campaign sign on his lawn for a candidate for the Town of Colden Highway Superintendent. *Id.,* p. 301. After his transfer to the Tonawanda barn, plaintiff went to two "Meet the Candidates" forums sponsored by his union. *Id.,* p. 304. Plaintiff testified that there were times when Naylon treated him professionally and with respect. *Id.,* p. 272.

In further opposition to the motion for summary judgment, plaintiff submitted deposition testimony and affidavits of other former employees of the Aurora barn. Paul Rebrovich testified that Naylon bragged about his personal friendship with Joel Giambra (Item 102, Exh. C, pp. 11, 13), and told Rebrovich that he would "get rid of this old regime . . . ." *Id.,* p.14. Anthony Marchitte stated in an affidavit that Naylon told him that things around the Aurora barn were going to change and that certain employees were going to "be gone." Marchitte understood this to mean that Naylon was going to get rid of all the non-Giambra affiliated employees (Item 102, Exh. D, ¶ 6). Timothy Elliott stated in an affidavit that he was transferred from the Aurora barn as a disciplinary punishment (Item 102, Exh. E, ¶ 4). He stated that Naylon told him, "that was the old regime, this is the new regime," and that "we know you guys are all democrats, hired by the other administration." *Id.,* ¶¶ 5, 7.

Gale Wrobel, plaintiff's wife, testified that she contacted a reporter for the *Buffalo News* sometime in 2001, after her husband's transfer to the Tonawanda facility (Item 102, Exh. B, pp. 50, 58). She stated that they contacted EEO and the State Attorney General, but "no one would help." *Id.,* pp. 50-51. She also attempted to express her concerns to Maria Lehman, the Erie County Administrator of Public Works on April 9, 2002, the day of plaintiff's arbitration hearing, but Ms. Lehman was busy. *Id.,* pp. 60-62. Mrs. Wrobel attempted to speak with two county legislators when plaintiff got the notice of his disciplinary hearing. She left a message with their secretaries, but they did not return her calls. *Id.,* p. 65.

Sometime in the summer of 2001, Mrs. Wrobel commenced her own investigation of Naylon. She visited Naylon's private land development site and looked for equipment

and "[a]nything that looked suspect." (Item 102, Exh. B, p. 119). She carried a video camera on the chance that she "might have had an occasion to watch equipment being transported to a place where it shouldn't have been to Naylon's private development." *Id.,* p. 144. Mrs. Wrobel once videotaped County employees on a paving job because they were "Naylon's buddies" who were "getting paid above their title pay." *Id.,* pp. 127-28. In December 2001, she went to the Holland Hotel where County employees were gathering for a Christmas party. She saw Naylon's and Rider's vehicles and "was waiting for Dan Rider to come out and start diving drunk" so that she could call the police and have him arrested. *Id.,* p. 164.

Mrs. Wrobel was unhappy with the arbitration award and contacted the union, the arbitrator, the American Arbitration Association, and the FBI (Item 102, Exh. B, pp. 184-86). Mrs. Wrobel tried to get information on her husband's behalf, including his Erie County personnel file, but was told that he had to request the records himself. Mrs. Wrobel then obtained her husband's power of attorney and requested the records in April 2001. *Id.,* pp. 209-13. Mrs. Wrobel also felt that her husband was incapable of advocating for himself. *Id.,* p. 207. The power of attorney, signed June 11, 2001, is attached to Mrs. Wrobel's affidavit (Item 110, Exh. 1).

On October 20, 2003, a special Grand Jury was impaneled to investigate "both criminal and non-criminal matters relating to the practices and behaviors of the Erie County Highway Department." (Item 102, Exh. G, p. 1). In its report, the Grand Jury found that "[w]ithin weeks of being hired, a new Highway Division Manger began to discipline his subordinates. Union grievances started piling up against him, and the County lost arbitration after arbitration." Unfortunately, the Grand Jury continued, "[n]o one effectively

dealt with this misuse of discipline by a manager . . . ."  *Id.,* pp. 25-26.  The grand jury also found that this manager "meted out disciplinary transfers against employees that he did not like," a disciplinary measure that is forbidden by the union contract.  *Id.,* p. 27.  Without mentioning the names of the employees involved, the grand jury cited plaintiff's transfer to the Tonawanda facility, which was considered by some County officials to be a disciplinary transfer.  County officials did not act to reverse the transfer as a matter of fairness to the employee, and the transfer was upheld in arbitration based on the "management's general ability to manage the workforce."  *Id.,* p. 29.  The grand jury concluded that "certain employees were harmed by the abuse of the disciplinary process," *Id.,* p. 34, and recommended that the Commissioner of the Department of Public Works and the Director of Labor Relations "devise a plan to review past disciplinary actions that might have hurt good people."  *Id.,* p. 98.

In support of the motion, defendant Naylon submitted a declaration in which he stated that at no point before the commencement of the litigation was he aware of "any published opinions or commentaries" of Gale Wrobel, nor was he aware that plaintiff or Mrs. Wrobel contacted Steve Pigeon, Eliot Spitzer, the FBI, or any other state, federal, or local authorities regarding any matter concerning the Erie County Highway Department (Item 87, Appx. F, ¶¶ 6, 7).  Similarly, defendant Rider also submitted a declaration denying his knowledge of any contacts between plaintiff, Mrs. Wrobel, and any authorities (Item 87, Appx. B).

**DISCUSSION**

**1. Summary Judgment Standard**

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The court "construe[s] the evidence in the light most favorable to the non-moving party and . . . draw[s] all reasonable inferences in its favor." *Huminski v. Corsones*, 396 F.3d 53, 69-70 (2d Cir. 2005) (internal quotation marks omitted). "[I]f there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party, summary judgment must be denied." *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 315 (2d Cir. 2006) (internal quotation marks omitted). "The moving party bears the burden of showing that he or she is entitled to summary judgment." *Huminski*, 396 F.3d at 69. "[T]he burden on the moving party may be discharged by 'showing'–that is pointing out to the district court–that there is an absence of evidence to support the nonmoving party's case." *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (internal quotation marks omitted). "If the party moving for summary judgment demonstrates the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor." *Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp.*, 302 F.3d 83, 91 (2d Cir. 2002).

## 2. Plaintiff's First Amendment Association Claim

Following his appeal to the Second Circuit, plaintiff's amended complaint contains two separate violations of the First Amendment.[3]  First, plaintiff alleges that defendants "actively, and motivated by political animus, and in retaliation for [plaintiff's] actions in failing to 'go along' with [defendants'] unlawful activities, participated in concert in a selective and targeted harassment of [plaintiff]."  Item 36, ¶ 66.  Plaintiff alleges that he was targeted "solely because of his actual or perceived political beliefs and because of his actual or perceived support of and friendship with members of the former" County administration, in violation of the First Amendment rights to free speech and political association.  *Id.,* ¶¶ 68, 71.

In its summary order, the Second Circuit reinstated this cause of action for the violation of plaintiff's First Amendment right to freedom of association.  This court had previously concluded that plaintiff had failed to allege constitutionally protected associational conduct, a conclusion the Second Circuit found erroneous.  The circuit court found that "[w]hen reasonable inferences [were] drawn in Wrobel's favor, the amended complaint sufficiently alleges that Wrobel was retaliated against for his lack of political affiliation with, or his refusal to pledge his allegiance to, the new Erie County administration." (Item 63, p. 3).

---

[3]  Plaintiff's third cause of action, in which he alleged that he was subjected to harassment because his wife spoke out against the unlawful treatment of employees at the Aurora facility and the activities of the individual defendants, was dismissed by this court, and the dismissal was affirmed by the Second Circuit (Items 59, 63).  Plaintiff has presented no additional evidence that would suggest that any adverse action was taken against him for the First Amendment activities of his wife.

The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I. Although freedom of expressive association "is not explicitly set out in the Amendment, it has long been held to be implicit in the freedoms of speech, assembly, and petition." *Healy v. James*, 408 U.S. 169, 181 (1972). The First Amendment, applicable to the states through the Due Process Clause of the Fourteenth Amendment, thus prohibits a state from abridging an individual's "'right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends,'" *Boy Scouts of America v. Dale,* 530 U.S. 640, 647 (2000) (quoting *Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984)), and from denying an individual citizen "rights and privileges solely because of [his] association with an unpopular organization." *Healy,* 408 U.S. at 186. The Supreme Court has recognized that individuals have a First Amendment right to associate in order to advance shared beliefs. *See Green Party of New York State v. New York State Bd. of Elections*, 389 F.3d 411, 418-19 (2d Cir. 2004) (citing *NAACP v. Alabama*, 357 U.S. 449, 460 (1958)). Among the most highly protected forms of association is that undertaken to express opinions on public issues. *See NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913 (1982). Such First Amendment expression "'is more than self-expression; it is the essence of self-government.'" *Id.* (quoting *Garrison v. Louisiana*, 379 U.S. 64, 74-75 (1964)).

To prevail on a First Amendment claim asserted under 42 U.S.C. § 1983, a plaintiff must prove by a preponderance of the evidence that (1) his expression at issue was constitutionally protected, (2) the alleged retaliatory action adversely affected his

constitutionally protected expression, and (3) a causal relationship existed between the constitutionally protected expression and the retaliatory action. *Camacho v. Brandon,* 317 F.3d 153, 160 (2d Cir. 2003). In order to prevail on a First Amendment freedom-of-expressive-association claim, a government employee must also show that his expressive association involved a matter of public concern–just as would a government employee complaining of a violation of his right to freedom of speech. *See Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 283-87 (1977); *Cobb v. Pozzi,* 363 F.3d 89, 102 (2d Cir. 2004).

In order to show that he suffered retaliation on the basis of his First Amendment associational activity, plaintiff must establish that he participated in some constitutionally protected associational activity. In his memorandum of law in opposition to the motions, plaintiff states that the Second Circuit "has already determined the first two prongs of the political association claim," (Item 103, p. 4), holding that plaintiff's expression was protected and that it was a question of fact for a jury to decide whether the actions taken against plaintiff adversely affected his constitutionally protected expression. *Id.* Elsewhere in his brief, plaintiff states that the Second Circuit court found "protected associational conduct, to wit, political affiliation or lack thereof . . . " (*Id.*, p. 2).

Plaintiff gravely misstates the Second Circuit's determination in asserting that the circuit court found that he was engaged in protected associational conduct. The Second Circuit merely stated that, when reasonable inferences were drawn in plaintiff's favor, he had sufficiently alleged protected associational conduct. That is to say, plaintiff alleged that he was retaliated against for his lack of affiliation with the new County administration and his refusal to pledge his allegiance to the new administration, and that if the truth of

16

these allegations were accepted, then plaintiff's cause of action would survive a motion to dismiss. On this motion, the court does not assume the truth of plaintiff's allegations, but "must examine the evidence in the light most favorable to the party opposing the motion, and resolve ambiguities and draw reasonable inferences against the moving party." *Abramson v. Pataki*, 278 F.3d 93, 101 (2d Cir. 2002) (internal quotation marks omitted); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Plaintiff must present "affirmative and specific evidence showing that there is a genuine issue for trial, and may not rely upon "mere allegations, denials, conjectures or conclusory statements . . . ." *See Mattera v. JP Morgan Chase Corp.*, ___F.Supp.2d ___, 2010 WL 3785576, *6 (S.D.N.Y. September 30, 2010) (citing *Anderson*, 477 U.S. at 256-57; *Gross v. Nat'l Broad. Co.*, 232 F.Supp.2d 58, 67 (S.D.N.Y.2002)). In response to the defendants' motions for summary judgment, plaintiff has failed to show either that he was not politically affiliated with the new administration or that he refused to pledge his allegiance to the new County Executive.

A thorough review of plaintiff's lengthy deposition reveals that he did not participate in protected associational activity prior to the alleged harassment by Naylon and his transfer to the Tonawanda barn. It is not enough for plaintiff to state that he was hired during the administration of a previous County Executive and thus to argue that he was not "politically affiliated" with a subsequent administration.[4] If that were sufficient, any municipal employee could establish protected associational conduct by virtue of a change

---

[4] The court takes notice of the relevant local political history. When plaintiff began his employment with Erie County in 1978, the County Executive was a Republican, Edward Regan. Regan left the office to become New York State Comptroller in 1979, and was replaced by Edward Rutkowski, another Republican and former Buffalo Bills back-up quarterback, who then won two full terms in 1979 and 1983. In 1987, Dennis Gorski defeated Rutkowski and became the first Democratic County Executive. In 1999, Gorski was defeated by Joel Giambra, who had recently switched from the Democratic to the Republican Party.

in administration, regardless of the employee's actions or party affiliation. In this case, plaintiff admits he was a member of the same political party as County Executive Giambra and defendant Naylon and denied that he was asked to "pledge his allegiance" to the new administration, either literally or figuratively. He was not asked to contribute to a campaign or support a particular candidate. He was not prevented from taking part in any particular political activity. He stated that he was unaware of any political activity by his co-workers and was unaware of their political affiliations. There is no proof that plaintiff had any particular political affiliation or allegiance to any previous administration. The record reveals that a neighbor told him about job openings in the Department of Public Works, plaintiff applied for a job, and was hired, without any political connection whatsoever.

Simply holding a municipal position and having friendly relationships with your co-workers (and unfriendly relationships with your superiors) is not protected associational activity for purposes of the First Amendment. For a public employee to show retaliation, the protected activity must involve expression on a matter of some public concern. "When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment." *Connick v. Myers*, 461 U.S. 138, 146 (1983). Speech or associational conduct pertaining to internal personnel disputes and working conditions is generally held not to involve matters of public concern. *Id.* at 147. If an organization engages in advocacy on a matter of public concern, the individual's association with the organization may constitute, at least vicariously, expressive conduct on a matter of public concern. *See generally Roberts v. United States Jaycees,* 468 U.S. at 622; *Melzer v. Board of Education*,

18

336 F.3d 185, 195-96 (2d Cir. 2003), *cert. denied,* 540 U.S. 1183 (2004). Alternatively, where the organization itself does not purport to engage in advocacy on matters of public concern, but the nature or character of the organization is a matter of public concern, the individual's association with the organization, and thus the approval or endorsement of the nature and character of the organization, may in some cases constitute expressive conduct on a matter of public concern. *See Piscottano v. Murphy*, 511 F.3d 247, 274 (2d Cir. 2007) (by consorting with motorcycle club members and wearing club colors, plaintiffs approved of a club criticized by others and thus engaged in expressive conduct on a topic of public concern); *cf. Gonzalez-Cifuentes v. Torres*, 2007 WL 499620, *4 (N.D.N.Y. February 13, 2007) (inmate unsuccessfully alleged that a cash gift to prison employee was an exercise of the First Amendment). Here, plaintiff has not offered proof that he was a member of any specific group, much less an organization involved in a matter of public concern. He simply was an employee of the County of Erie who was friendly with his co-workers. It is undisputed that "[t]he Constitution does not recognize a generalized right of social association." *Sanitation & Recycling Indus., Inc. v. City of New York,* 107 F.3d 985, 996 (2d Cir. 1997).

Moreover, the fact that Naylon on one occasion asked plaintiff about his political affiliation and referred to the workers at the Aurora Barn as the "old regime" does not create protected political associational conduct on plaintiff's part. According to the plaintiff, Naylon asked him his party affiliation on the first day of Naylon's tenure. Thus, there is no dispute that Naylon knew that plaintiff shared his political affiliation and that of the new County Executive. It is apparent that the alleged harassment suffered by plaintiff at the hands of Naylon occurred for some reason other than political party affiliation.

As plaintiff has failed to establish any associational conduct protected by the First Amendment, the defendants' motions for summary judgment are granted, and the claim based on plaintiff's associational conduct is dismissed.

### 3. Plaintiff's First Amendment Free Speech Claim

As a second cause of action, plaintiff alleges that he was harassed in retaliation for his statements regarding the unlawful treatment of employees at the Aurora facility and the fraudulent and illegal activities of the individual defendants, in violation of the First Amendment right to free speech (Item 36, ¶¶ 75, 79, 81). The Second Circuit agreed with this court that plaintiff's speech prior to his transfer to the Tonawanda barn did not involve a matter of public concern, but found that plaintiff had adequately alleged protected speech following his transfer (Item 63, p. 3). Additionally, the Second Circuit court found that plaintiff's allegations, that "Naylon implicated him as the perpetrator of a theft of government property . . .", and that defendants Naylon and Rider "bribed others to testify against him at an arbitration hearing," if proven true, would constituted actionable retaliation. *Id.,* pp. 3-4.

A public employee who makes a First Amendment claim of retaliation pursuant to section 1983 must show that: (1) the plaintiff engaged in protected speech; (2) he suffered an adverse employment action, and (3) there is a causal connection between the protected speech and that adverse employment decision, so that it can be said that the plaintiff's speech was a motivating factor in the adverse employment action. *See Garcetti v. Ceballos,* 547 U.S. 410, 418 (2006); *Cioffi v. Averill Park Central School Dist. Board of Ed.*, 444 F.3d 158, 162 (2d Cir.), *cert. denied,* 549 U.S. 953 (2006). In this case, even

assuming that plaintiff engaged in protected speech, he has failed to show that he suffered any actionable retaliatory action or that a causal connection exists between the protected speech and the alleged retaliation.

The record reflects that plaintiff spoke with an agent of the FBI on August 23, 2001 at the home of Linda King, and sometime later on the telephone regarding his allegations of illegal activities at the Aurora barn. The FBI records of these contacts indicate that plaintiff's identity was kept confidential (Item 88, Appx. U). Plaintiff also argues, without any legal support, that his wife spoke out regarding the allegedly illegal activities at the Aurora barn and that her speech should be attributed to him because she held his power of attorney. Mrs. Wrobel testified that she co-authored two letters, one to then-Democratic Party Chairman Steve Pigeon and one to then-Attorney General Eliot Spitzer, in which she complained of the activities of Naylon and Rider. Neither letter was signed by an individual, only by "Concerned Erie County employees." Mrs. Wrobel also testified, without factual elaboration, that she contacted "EEO," the New York State Attorney General, and various news media outlets.

Even if the court were to assume for purposes of this motion that plaintiff engaged in protected speech on a matter of public concern, he has failed to offer proof of actionable retaliation–that is, action which well might have dissuaded a reasonable worker from asserting First Amendment-protected rights. *See Burlington Northern and Santa Fe Ry. Co. v. White,* 548 U.S 53, 68 (2006). Now that the parties have completed discovery, it is apparent that plaintiff's proof does not support the retaliatory actions alleged in the amended complaint. Plaintiff admitted at his deposition that none of the people that he alleged was "bribed" to testify against him at his arbitration hearing actually testified. At

best, plaintiff presented hearsay allegations that certain people were "encouraged" to testify, but it is undisputed that none did so. Thus, plaintiff was not the subject of any retaliatory action in connection with his arbitration. Similarly, plaintiff failed to offer proof that Naylon implicated him as the perpetrator of a theft of lumber from the Aurora barn or initiated a criminal investigation against him. At his deposition, plaintiff testified that he was visited at the Tonawanda barn by an investigator from the Erie County Sheriff's Department who was looking into a theft of lumber from the Aurora barn. Plaintiff was asked some questions, he denied having access to the lumber, the investigator left, and plaintiff was not questioned further. He was unable to say if other County employees had been similarly questioned or if Naylon had in fact "implicated him as the perpetrator of a theft of government property . . . ." (Item 63, p. 3). The court concludes that a single conversation with a Sheriff's Department investigator, even if instigated by Naylon, is not the type of adverse action that would dissuade a reasonable worker from asserting his rights under the First Amendment. The proof simply does not bear out plaintiff's allegation that Naylon implicated him as the perpetrator in the theft of government property or commenced a criminal investigation against him.

Finally, even if the court were to assume that plaintiff engaged in protected speech by virtue of his own conversations or those of his wife, and even further assuming that the conversation with the Sheriff's Department investigator constituted actionable retaliation, plaintiff has presented no proof of a causal connection between the retaliatory action and his expression of First Amendment speech. To establish causation, a plaintiff "must show that the protected speech was a substantial motivating factor in the adverse employment action . . . ." *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d at 167 (quotation

marks omitted). "A plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action." *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009); *see also Gorman-Bakos v. Cornell Co-op Extension of Schenectady County,* 252 F.3d 545, 554 (2d Cir. 2001) ("In this Circuit, a plaintiff can indirectly establish a causal connection to support a . . . retaliation claim by showing that the protected activity was closely followed in time by the adverse [employment] action." (internal quotation marks omitted; alteration in original)).

In his brief, plaintiff argues that he was visited by the Sheriff's Department investigator just "days after" the August meeting with the FBI agent at Linda King's house (Item 103, p. 15). A review of the record merely indicates that this visit took place "shortly after [plaintiff] left the East Aurora district." (Item 102, Exh. A, p. 444.) Elsewhere, plaintiff testified that he "believed" the conversation with the investigator occurred following his contact with the FBI. *Id.,* p. 447. Even if the visit by the investigator occurred sometime after the meeting with the FBI agent, plaintiff has failed to offer any proof that the defendants were aware of his protected speech. The defendants have denied any knowledge of plaintiff's contact with the FBI, there is nothing in the record to suggest that Naylon and Rider were aware of those contacts, and the FBI records indicate that plaintiff's identity was kept confidential. Similarly, the letters co-authored by Mrs. Wrobel to Steve Pigeon and Eliot Spitzer were signed by "Concerned Erie County employees." Thus, there is no proof that the defendants had any knowledge of plaintiff's alleged First Amendment speech. *See Tucker v. New York City,* 376 Fed. Appx. 100, 104 (2d Cir. 2010) (plaintiff not entitled to relief on First Amendment retaliation claim where he "cannot show that hiring decisionmakers were aware of his only conceivably protected speech"); *Pavone v. Puglisi*,

353 Fed. Appx. 622, 625 (2d Cir. 2009), *cert. denied,* ___U.S.___, 130 S.Ct. 2377 (2010) ("Although a causal connection between an adverse action and protected speech may be indirectly established by showing that protected activity was followed closely in time by the adverse action, a plaintiff must still allege that defendants were aware of the protected activity" (internal cites omitted)).

Additionally, plaintiff argues that Mrs. Wrobel telephoned the New York State Attorney General's office in July 2001 and that approximately one week later, plaintiff was called to the office and was "interrogated" for over an hour by Mr. Rider, who told plaintiff to tell his wife to stay out of County buildings (Item 103, p. 14). The court has reviewed the record and the particular pages cited in the plaintiff's brief, and finds no mention of a telephone call by Mrs. Wrobel to the Attorney General's office in July 2010 or any specific date on which the conversation with Rider occurred. Again, there is nothing in the record to indicate that any retaliatory action occurred following the expression of protected speech. Moreover, plaintiff cannot rely on "mere allegations, denials, conjectures or conclusory statements, but must present affirmative and specific evidence showing that there is a genuine issue for trial." *Mattera v. JP Morgan Chase Corp.,* ___F.Supp.2d ___, 2010 WL 3785576, *6 (S.D.N.Y. September 30, 2010) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 256-57). Given the lack of proof that the defendants were aware of the plaintiff's allegedly protected speech, plaintiff has failed to raise a genuine issue of material

fact regarding causation.[5]  Accordingly, the motions for summary judgment are granted, and the claim based on the First Amendment freedom of expression is dismissed.[6]

## CONCLUSION

The defendants' motions for summary judgment are granted, the amended complaint is dismissed, and the Clerk is directed to enter judgment in favor of the defendants.

So ordered.

\s\ John T. Curtin
JOHN T. CURTIN
United States District Judge

Dated:  November   11   , 2010

p:\opinions\03-277.oct292010

---

[5]  In his brief, plaintiff argues that defendant Rider confronted Mrs. Wrobel at plaintiff's arbitration hearing in 2002 and called her a "liar," thus admitting that he was aware of her protected speech on plaintiff's behalf (Item 103, pp. 16-17).  Again, even crediting this testimony, it does not establish a causal relationship between protected speech and any actionable retaliation against plaintiff.

[6]  As plaintiff has failed to sustain his burden on the motions for summary judgment, the court declines to address the defendants' arguments regarding municipal liability and qualified immunity.